Opinion issued February 26, 2004












In The
Court of Appeals
For The
First District of Texas




NO. 01-03-00150-CR
____________

MOHAMMAD NASIR, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 185th District Court 
Harris County, Texas
Trial Court Cause No. 900424 




MEMORANDUM OPINION
          A jury found appellant, Mohammad Nasir, guilty of murder and assessed
punishment at life in prison. In two points of error, appellant challenges the legal and
factual sufficiency of the evidence to support his conviction. We affirm.
Background

          On January 19, 2002, beginning at approximately noon, the Harris County
Sheriff’s Department responded to several 911 calls originating from appellant’s
house. After going to the house, finding it locked up and secure, and seeing nothing
out of the ordinary, Deputy L.E. Walker left the scene. By the third call, it was
obvious that there was a person in the house needing assistance. The officers who
responded to the third call found that the front door had been opened about an inch. 
After entering and going upstairs, the officers found appellant lying in one bedroom
with a wounded neck, but still breathing. The officers also found a large knife in the
bed near appellant. Sergeant Dennis Brown immediately called Emergency Medical
Services and Life Flight to attend to appellant. Appellant was eventually taken to
Memorial Hermann Hospital, where he stayed for two weeks to recover from his
injuries.
          In the bedroom next to the one that appellant occupied, the officers found
appellant’s six-year-old son dead, with a large knife wound to his neck. They also
found a large amount of blood on the bathroom floor, a large amount of blood in both
bedrooms upstairs, and a drop of blood near a note on the kitchen counter. The note
contained some bloody fingerprints, along with appellant’s wife’s name and a
telephone number. The lower level of the house otherwise appeared to be in order,
and there were no signs of a break-in or burglary. No one else was present in the
house when the officers arrived. The officers called the number on the note that they
found in the kitchen and determined that it was for appellant’s wife’s cell phone. 
Appellant’s wife was in Dallas, and she immediately returned to Houston. Appellant
was later charged with the murder of his son. 
Legal Sufficiency
          In his second point of error, appellant challenges the legal sufficiency of the
evidence to prove that he murdered his son.
          In reviewing legal sufficiency, we view the evidence in the light most favorable
to the verdict and ask whether any rational trier of fact could find the essential
elements of the crime beyond a reasonable doubt. King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000); Valencia v. State, 51 S.W.3d 418, 423 (Tex. App.—Houston
[1st Dist.] 2001, pet. ref’d). The jury may reasonably infer facts from the evidence
before it, credit the witnesses if it cares to, disbelieve any or all of the testimony
proffered, and weigh the evidence in the manner that it chooses. Bruno v. State, 922
S.W.2d 292, 293 (Tex.App.—Amarillo 1996, no pet.).
          A person commits murder if he intentionally or knowingly causes the death of
an individual. Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). The State
charged appellant with intentionally or knowingly causing the death of his son,
Osama, by cutting him with a knife. 
          Appellant contends that the State relied heavily on appellant’s videotaped
confession in the hospital two days after the crime was committed. He asserts that the
confession was not legally sufficient to convict him because appellant’s eyes were
closed the entire time and he had tubes coming out of his throat and nose.
          However, even without considering the videotaped confession, there was ample
evidence from which a rational juror could have found that appellant had committed
the crime beyond a reasonable doubt. Based on information that appellant wanted to
kill himself, Dr. Jose Carranza, a psychiatrist at Memorial Hermann Hospital,
interviewed appellant the same day that appellant gave the videotaped confession. 
Dr. Carranza testified to the following:
Q [By Prosecutor]: Okay. Now, you indicated you asked the defendant
what at first?
 
A [Dr. Carranza]: I asked him, Did you try to kill yourself? He said, Yes
(nods head affirmatively).
 
Q: What’s the next thing you asked?
          
          A: I said, Do you still want to die? He said, Yes (nods head affirmatively).
 
Q: What’s the next thing you asked?
 
A: I heard—because I heard that from the nurses and from everyone at
Hermann and the emergency room people, I told him, Did you want to
kill yourself because you killed your son? And he said, Yes (nods head
affirmatively).
 
Q: And was there any doubt in your mind that the defendant understood what
you were asking him before he gave you these answers?

          A: No. He was clearly understanding of my questions.

Dr. Carranza also requested Dr. Ateka Zaki to assist him by interpreting an interview
between appellant and himself on January 22 because both Dr. Zaki and appellant
came from Pakistan and spoke Urdu. Dr. Zaki asked appellant several questions in
Urdu, and appellant responded by nodding his head “yes” or “no.” Dr. Zaki testified
that she had asked appellant if he had killed his son and whether appellant had cut
himself. Appellant nodded affirmatively to both questions. Dr. Zaki stated that she
was not sure if appellant understood her questions because she was there to interpret,
not to evaluate his mental status.  
          Other facts adduced at trial are consistent with appellant’s admission and
support the verdict. Appellant and his son were the only two persons in the house
when the officers arrived, there was no sign of forced entry, all doors leading into the
house were locked, and all but one of the doors were also deadbolted. Appellant had
to let the officers in by unlocking the front door. The officers found a knife within
a foot of where appellant was lying on the bed. Although appellant testified that a
Mexican intruder came in and robbed appellant with the knife, took a bag of money,
then later cut appellant’s throat, there was no sign that the house had been ransacked. 
In addition, Deputy Joe Noguera testified that the location and appearance of blood
spatter on the wall in appellant’s bedroom were consistent with a self-inflicted
wound. Although appellant’s son had many “defensive wounds” on his hands, most
likely from his being cut while attempting to fight off his attacker, appellant had no
such wounds on his hands. Moreover, the DNA evidence collected from the
bathroom floor indicated that there was a large pool of appellant’s son’s blood mixed
with appellant’s blood.  
          When appellant’s wife arrived home later that same day, she gave a statement
to the officers that contained the following description:
I know that when Mohammed [sic] is angry, he doesn’t think about
anything. He just does things and lash out. That is the only reason that
I can think of for why he might have hurt Osama, if he did. He loves
Osama and me, but when he is angry he doesn’t know what he is going
to do. There is no reason culturally for him to take Osama’s life, then
his own. My mother-in-law told me that before Mohammed and I were
married, Mohammed tried to kill himself two or three times; two times
with a knife. I don’t know what the third time was with. I didn’t take
her too serious because we were just talking.

At trial, appellant’s wife recanted her statement, testifying that her English was not
that good, that she did not read the statement before she signed it, and that she was
out of her mind at the time that she made the statement. It was the jury’s duty, as the
sole fact finder, to weigh the evidence and the credibility of the witnesses and to
examine this evidence and to weigh appellant’s wife’s testimony together with the
other evidence adduced at trial. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App.
2000). Viewing the evidence in the light most favorable to the verdict, we conclude
that ample evidence exists from which a rational juror could have found beyond a
reasonable doubt that appellant intentionally or knowingly killed his son with a knife.
          We overrule point of error two.
Factual Sufficiency
          In point of error one, appellant challenges the factual sufficiency of the
evidence to prove that he murdered his son. In a factual-sufficiency review, we
examine all of the evidence neutrally and ask whether proof of guilt is so obviously
weak as to undermine confidence in the jury’s determination or so greatly outweighed
by contrary proof as to indicate that a manifest injustice has occurred. Zuliani v.
State, 97 S.W.3d 589, 593-94 (Tex. Crim. App. 2003); King, 29 S.W.3d at 563;
Valencia, 51 S.W.3d at 423. Our factual-sufficiency review must be appropriately
deferential to the jury’s determination so as to avoid substituting our judgment for
that of the jury, even if we disagree with its determination. King, 29 S.W.3d at 563. 
The jury is the sole judge of the weight and credibility of the witness testimony. 
Johnson, 23 S.W.3d at 7. Accordingly, we reverse the jury’s determination only
when a manifest injustice has occurred. Id. at 12.
          First, appellant asserts that the evidence is factually insufficient because the
officers did not attempt to fingerprint the door knobs on any of the doors leading into
the home. He contends that this is especially important because the subsequent
investigation determined that a third person’s DNA was present on the bathroom
floor, where large amounts of blood were found.
          The officers collected fingerprint samples in the bathroom and downstairs in
the kitchen on the note that appellant had written on the back of one of his son’s
drawings. The officers identified appellant’s fingerprints, one in the bathroom and
one on the note. The only other fingerprints that had sufficient identifying
characteristics were of appellant’s son, on the same note. The knife was also checked
for fingerprints, but none were recovered. Deputy Noguera testified that fingerprints
are often not found. Moreover, appellant testified that the unknown intruder was
wearing gloves. Therefore, even if the officers had dusted the doors for fingerprints,
the alleged intruder would not have left any, under appellant’s version of events.
          Katherine Welch, the DNA technical leader of the Harris County Medical
Examiner’s office, analyzed three representative samples, or “swabs,” taken from the
linoleum bathroom floor of appellant’s house. The DNA in two of the samples was
consistent with appellant’s DNA only. In the third sample, the blood was mixed, and
Welch determined that appellant’s son was the major contributor and that appellant
was a minor contributor. One allele


 found in the third sample was inconsistent with
the DNA of either appellant or his son. Welch confirmed that the unidentified DNA
could have come from any organic substance that might have been on the bathroom
floor. There was thus no way to tell when this unknown DNA was left on the floor,
or from what source, or from whom it came.
          Appellant next asserts that the evidence was factually insufficient because he
testified that he had moved from his bed to open the door for the officers so that the
position of the stains on the bed and the proximity of the knife to appellant when the
officers got into the house were immaterial. Appellant further relies on the facts that
no fingerprints were found on the knife, a second knife was missing from the kitchen,
and there was no evidence linking appellant’s son’s blood to the knife found in the
bedroom. 
          Dr. Dwayne Arthur Wolf, the senior deputy chief medical examiner in the
Harris County Medical Examiner’s office, testified that appellant’s son’s wounds on
his neck, back, and hands were sharp-force injuries caused by a knife. The fact that
appellant had moved from the bed to let the officers into his house does not negate
the evidence that appellant had been lying in the bed prior to that time, as shown by
the blood and defecation stains on the bed. 
          Although there was a second knife missing from the kitchen, there was no
evidence that the missing knife was actually in the kitchen prior to the crime. Deputy
Noguera testified that “there were two knives missing. There was a big one and then
I believe up here there was another slot that contained, I think, a small paring knife
or something that wasn’t found.” Deputy Noguera testified that the knife found in
appellant’s bedroom was “the same style and the same brand as the knives recovered
from that wood block.” The jury, as the sole trier of fact, was free to believe that the
large knife found on appellant’s bed was the knife used in the murder and not another
knife that had been missing for an unknown period of time. 
          Appellant also asserts that the evidence is factually insufficient because he did
not confess to the murder while Detective Hunter interviewed him in the hospital at
approximately 1 p.m. on January 21. Although appellant never opened his eyes
during the interview with Detective Hunter, he did move his left hand when Detective
Hunter asked him to, and he appeared to respond by nodding his head to indicate that
he had tried to hurt himself and he had killed his son. Furthermore, in his interview
with Dr. Carranza earlier that same morning, appellant indicated by nodding that he
had killed his son and had tried to kill himself. In addition, a nurse’s note from the
same day stated that “[p]atient became more awake this morning. Opens eyes to
voice, follows commands . . . answers yes/no to questions with gestures.”
          Appellant’s wife, brother, and sister-in-law testified that, when they saw
appellant on the night of January 21, he was not responsive, except that he had tears
in his eyes. Appellant asserts that, given the amount of medication that he was
taking, even affirmative answers to the inculpatory questions were meaningless. 
However, as the exclusive judge of the facts, the credibility of the witnesses, and the
weight to be given their testimony, the jury could disbelieve all or any part of
witnesses’ testimony. See McKinny v. State, 76 S.W.3d 463, 468-69 (Tex.
App.—Houston [1st Dist.] 2002, no pet.). The jury apparently chose to believe the
testimony of Dr. Carranza and Detective Hunter, and the hospital records indicating
that appellant was responsive on January 21, and to disbelieve the testimony of
appellant’s relatives. In a factual-sufficiency review, the reviewing court should not
substitute its own judgment for that of the jury. See Jones v. State, 944 S.W.2d 642,
648 (Tex. Crim. App. 1996).
          Moreover, there is a considerable amount of other evidence upon which the
jury could have based its verdict of guilt. Although appellant testified that an intruder
had broken in and committed the murder, there was no sign that anyone had entered
the completely locked house by force or had taken anything valuable from the house. 
Appellant was found lying in bed with his throat cut and a knife nearby, and Deputy
Noguera testified that the blood spatter on the wall was consistent with a self-inflicted
wound. Appellant made a statement to the officers that
[t]he Mexican male killed my son first with a kitchen knife, then he tried
to kill me by cutting my throat. My son was sleeping in his room when
the man first stabbed him. I was in the bedroom, next to his room when
he stabbed my son. My son never had the opportunity to get out of bed. 
I did not try to fight him back, because he was too big. The man then
stabbed me in the bedroom that is next to my son’s room. After the man
stabbed me, I called 911 and waited for the police to come.
 
Appellant testified that he was asleep and that the first thing that he remembered was
the intruder’s talking to him. According to appellant, the intruder then took a bag of
money and knocked appellant unconscious. Appellant was unable to explain on
cross-examination how he knew that his son was killed first or how he knew that his
son never had an opportunity to get out of bed, given the fact that appellant testified
that he had never left his bedroom while the intruder was in the house. Furthermore,
the physical evidence indicated that at least some portion of the attack on appellant’s
son had occurred in the bathroom. Therefore, appellant’s version of the events did
not match the physical evidence. 
          Given all of the evidence presented, the jury could have chosen not to believe
appellant’s version of events given later to the officers and could instead have
inferred from other evidence presented at trial that appellant had murdered his son. 
See Bruno, 922 S.W.2d at 293. Accordingly, we hold that proof of appellant’s guilt
is not so obviously weak as to undermine confidence in the jury’s determination or
so greatly outweighed by contrary proof as to indicate that a manifest injustice has
occurred.
          We overrule point of error two.
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Tim Taft
                                                                        Justice

Panel consists of Justices Taft, Keyes, and Bland.
Do not publish. Tex. R. App. P. 47.2.