**In the**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00185-CR**
_____

**BRANT MILLER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 7th District Court**
**Smith County, Texas**
**Trial Cause No. 007-0099-19**

**MEMORANDUM OPINION**

Brant Miller appeals his conviction for the first-degree felony offense of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03. A Smith County jury found Miller guilty and assessed punishment of fifty years' incarceration.[1] The trial court sentenced Miller accordingly, and Miller timely appealed. In one issue, Miller

---

[1] This case was transferred to this Court from the Twelfth Court of Appeals in Tyler, Texas pursuant to a docket equalization order. *See* Tex. Gov't Code Ann. § 73.001.

1

contends the trial court abused its discretion in denying his request for new counsel before the trial.

## I. Background

### A. Factual Background

In November of 2018, A.K.[2] worked as a pizza delivery driver and was delivering an order to an apartment complex near the University of Texas at Tyler. Someone placed an online order for hot wings using the name "Kevin James." Upon arrival at the apartment complex, A.K. went upstairs to the apartment unit listed on the order and knocked on the door but nobody answered. After a few moments, A.K. realized the unit was unoccupied and returned to his vehicle to call and verify the address.

As he reached into his vehicle to retrieve his phone, A.K. heard someone behind him instruct him to hand over his money. When A.K. turned around, the individual had a handgun pointed at him. Afraid for his life, A.K. reached into his left pocket and gave the individual the money customers had paid for pizza. Thereafter, the robber told A.K. to give him the food as well, and A.K. handed over the wings still in the box and inside of the insulated delivery bag.

---

[2] To protect the victim's privacy, we identify him by his initials. *See* Tex. Const. art. I, § 30(a)(1) (granting victims of crime "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

Although the individual allowed A.K. to get into his vehicle and leave, he kept the gun pointed at A.K. until A.K. was out of sight. A.K. immediately called 9-1-1 and provided a description of the individual who robbed him, which included that the person wore a black hoodie with a red emblem on the left side, dark shorts, and the white drawstring of the hoodie tied under his face. A.K. also told the 9-1-1 operator that he last saw the individual walking towards a storage shed in the apartment complex with the food.

It only took moments for multiple officers to arrive at the scene, where they promptly located Miller in the location A.K. described and wearing clothing that matched the description A.K. gave. Miller was holding a Domino's box when the officers saw him. He then tried to flee on foot, but officers quickly caught and detained him. Behind the shed where officers located Miller, they also found the insulated Domino's delivery bag and a .40 caliber Smith & Wesson handgun near the bag. The handgun did not have a magazine in it when they found it.

In addition to A.K.'s trial testimony, multiple police officers present at the scene that night also testified. During the trial, the State introduced video that showed Miller, wearing the clothing A.K. described to the 911 operator and holding a Domino's box, flee from officers when they attempted to detain him. The State also admitted photographs and video evidence of a gun near the pizza box behind the shed where they initially located Miller.

3

Finally, the State admitted dashcam video from inside the police vehicle where Miller sat while officers processed the scene. On that video, Miller can be seen taking a handgun magazine in and out of his pocket, placing it on the seat beside him, then ultimately leaning forward as if attempting to put it on the floorboard of the police car. Officers testified that when they later removed Miller from the vehicle to conduct a more thorough search of his person, they found a .40 caliber Smith & Wesson magazine in the patrol vehicle where Miller had been sitting that matched the handgun found near the shed. The detective assigned to work the case repeatedly characterized the evidence against Miller as "overwhelming."

**B. Complaints Regarding Appointed Counsel**

At docket call, the day before trial was scheduled to start, Miller and his appointed counsel appeared in court. Another attorney was also present and stated on the record that Miller's family had approached him about substituting in to represent Miller. The trial court noted that no motion to substitute had been filed. The potential attorney told the trial court that he was scheduled for trial in another court, but if the judge would grant a continuance for three weeks, he would be prepared and would substitute as Miller's counsel in the case. The trial court responded that it would only give a one-week continuance and asked if he was electing not to file a motion to substitute, at which time the other attorney stated,

"[T]hat's not enough time for me, so I'm not going to substitute in." Thereafter, Miller's appointed counsel advised the court that he was prepared to try the case.

The following day during a pretrial conference, the trial court allowed Miller to explain his dissatisfaction with his appointed counsel on the record. Miller represented to the trial court that he was dissatisfied with appointed counsel's representation. Miller told the judge that appointed counsel "was very rude" to his family, who tried to help and provide alibis; he was "very rude" to other character witnesses trying to help, and every time he came to visit Miller, "he was screaming, he was yelling." Miller also told the judge that when his mother called to talk to appointed counsel about the case, he hung up on her and "has been very, very rude to me every time I've talked to him." The trial court responded that it sounded like Miller did not like the interactions he had with appointed counsel, not that he was unable to communicate with him. Miller then replied,

> No, sir. I tried to communicate with him, and it always ended up with him yelling at me and - - how would I say it? He was just very vulgar toward me during any interactions we had. So it was more like him yelling at me; me just sitting there.

Appointed counsel then described the work he had done on the case, including using an investigator. Appointed counsel also explained that while the State had offered Miller twenty-five years on a plea, Miller refused, telling appointed counsel he could do better, but counsel represented to the court he advised Miller that was unlikely based on his investigation of the facts.

5

Miller then asked the trial court if appointed counsel had to represent him if he went to trial, and the trial court responded he did unless Miller hired another attorney who was prepared to try the case or he wanted to represent himself. Miller said that he did not want to represent himself and gave no indication that he had retained other counsel who was prepared to go to trial. He never verbally requested that the trial court appoint new counsel, nor did he ever file a motion to substitute counsel. Appointed counsel represented Miller during the trial.

The jury found Miller guilty of aggravated robbery with a deadly weapon and assessed punishment at fifty years' incarceration. Miller timely appealed.

## II. Analysis

In his sole issue, Miller complains that the trial court abused its discretion by denying his request for appointment of new counsel before the trial. Specifically, he argues that we should construe his complaints about counsel and attempts to hire a new attorney as a request for a new attorney.[3] As a prerequisite to presenting a complaint for appellate review, the record must show that the appellant presented the complaint to the trial judge by a timely request, objection, or motion. *See* Tex.

---

[3] In his brief, Miller acknowledges that in order "to have any merit[,] his claim requires the Court to construe his attempt to hire new counsel and complaints about appointed counsel to be construed as a request for new representation." Miller further concedes in his brief that if his "actions and statements cannot be construed as a specific or even implied request for new counsel, Appellant must acknowledge that his argument fails."

6

R. App. P. 33.1(a). The request, objection, or motion must state the grounds for the requested ruling with sufficient specificity to make the trial judge aware of the complaint, and the trial judge must rule or refuse to rule on the request, objection, or motion. *See id.* A party does not preserve error if he does not allow the trial judge to make a ruling. *Williams v. State*, 974 S.W.2d 324, 332 (Tex. App.—San Antonio 1998, pet. ref'd) (citing *Crum v. State*, 946 S.W.2d 349, 363 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd)) (discussing error preservation in the context of a motion to sever); *see also Rodriguez v. State*, No. 05-01-01249-CR, 2002 WL 31416293, at *4 (Tex. App.—Dallas Oct. 29, 2002, no pet.) (not designated for publication) ("Because appellant did not request the trial judge to appoint new counsel, he may not complain, on appeal, that the judge failed to do so.").

Despite Miller's complaints about appointed counsel's "rude" behavior, a motion to substitute counsel was never filed, and Miller never verbally asked the trial court to appoint new counsel.[4] The record reveals that the attorney Miller's family contacted and who appeared at docket call expressly declined to file a motion to substitute.[5] Therefore, the trial court never had an opportunity to rule. *See*

---

[4] We note that a trial court has no duty to search for counsel agreeable to a defendant, and "personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal." *See King v. State*, 29 S.W.3d 556, 566 (Tex. Crim. App. 2000).

[5] In addition to appointed counsel, the record reveals this attorney appeared at docket call to discuss his potential representation of Miller, but Miller's family,

7

*Williams*, 974 S.W.2d at 332. The closest Miller came to a verbal request was asking if appointed counsel had to represent him during the trial. Miller concedes in his brief that "he never specifically requested new appointed counsel," while at the same time he argues that "his attempt to retain a new attorney and that attorney's attempt to work out . . . a continuance . . . clearly indicate that Mr. Miller desired new representation." There is a distinction between desiring something and asking the trial court to grant specific relief. "[I]n addition to making the court aware of his dissatisfaction with counsel and stating the grounds for the dissatisfaction, a defendant also bears the responsibility of substantiating his claim." *Hill v. State*, 686 S.W.2d 184, 187 (Tex. Crim. App. 1985). Here, Miller never raised any complaint about appointed counsel's legal work, but instead he expressed dissatisfaction with the attorney's communication style and purportedly rude behavior. Miller could not name a single witness that appointed counsel failed to talk to or any specific legal task appointed counsel failed to undertake on his behalf.

Absent a motion to substitute counsel or a specifically articulated request for new counsel, there was nothing for the trial court to rule on, and Miller has failed to

rather than Miller himself, reached out to him. Miller was silent on the record as to whether he desired this attorney's representation.

preserve this complaint for review on appeal.[6] *See* Tex. R. App. P. 33.1(a); *Williams*, 974 S.W.2d at 332.

### III. Conclusion

Having determined that Miller never requested appointment of new counsel either orally or in writing, he failed to preserve this complaint for review. Accordingly, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on July 28, 2020
Opinion Delivered October 28, 2020
Do Not Publish

Before McKeithen, C.J., Kreger, and Johnson, JJ.

---

[6] Absent a specific request for new counsel, we are left to speculate regarding what relief Miller desired when he expressed his dissatisfaction with counsel. Those options could include: (1) simply having the trial court admonish his appointed attorney; (2) requiring the withdrawal of his appointed attorney; (3) substituting this specific new counsel; (4) substituting another unknown attorney; (5) some combination of all these options; or (6) none of these options. The only thing we know for sure from the record is that he did not retain new counsel, and he did not desire to represent himself. Without a specific request for a certain relief, we choose not to go down the slippery slope of speculation by attempting to surmise what Miller desired or whether those desires conformed with his family's chosen attorney when they sought new representation for him.

9