In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-00-272 CR


____________________



RHONDA CARTER, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 410th District Court


Montgomery County, Texas


Trial Court No. 00-03-01437-CR






O P I N I O N


 A jury convicted Rhonda Carter of felony theft, and the trial court sentenced her to
five years imprisonment. In her only point of error, she claims that the evidence was
factually insufficient to justify her conviction. In reviewing a factual sufficiency challenge,
we ask "whether a neutral review of all the evidence, both for and against the finding,
demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the
jury's determination . . . ." King v. State, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000)
(quoting Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). In addition, we ask
if the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary
proof. King, 29 S.W.3d at 563. We will reverse the factfinder's determination only if a
manifest injustice has occurred. Id. 

 Carter was accused of embezzling $37,000 from her employer, Turbine Ventilator
Company ("TVC"). Joe Worthy, Carter's former employer testified that Carter was
responsible for keeping track of the company's checkbook during the latter period of
Carter's employment. Jolyn Fontenot, office manager of TVC and a daughter of its
owner, testified that Carter first came under suspicion when a vendor asked about an
invoice. TVC's computer records showed that the invoice had been paid. Fontenot then
checked the corresponding stub in the company checkbook, which indicated that a check
had been written to the inquiring vendor for $600. However, an examination of the bank
statement revealed that the check had in fact been made out for $1,074, and had been made
payable to Rhonda Carter rather than to the vendor. At the time the check was written,
Carter had exclusive responsibility both for maintaining the checkbook and for posting paid
invoices on the computer. 

 Under oath, Fontenot identified forty-five stubs remaining in the company's
checkbook, most of which indicated that the accompanying checks had been made out to
various vendors. She also identified the accompanying checks, almost all of which had
been made payable to Rhonda Carter. Of the three checks not made out to Carter
personally, two were made out to Windcrest Springs. (1) The "FOR" line in the lower left
hand corner of these two checks contains the notation, "#121 Rhonda Carter." Fontenot
testified that Carter lived in Apartment 121 at Windcrest during some of the period Carter
worked for TVC. Having testified that she was familiar with Carter's signature, Fontenot
identified Carter's handwriting appearing on the endorsements of the checks in question.
Copies of the checks, their endorsements and the corresponding (falsified) check stubs
were entered into evidence. Fontenot testified that the amount of money stolen via the
checks in question damaged the company's financial standing so badly that the owners "let
everybody go except the family," and that even family members had to "rotate getting a
paycheck." When asked if the company had been "at risk of going under," Fontenot
answered in the affirmative. 

 Joe Worthy testified that he did not give Carter permission to make any of the forty-five checks in question -- totaling some $37,353.69 -- payable to herself. He testified that
he signed each of the checks only after being presented with an invoice or statement that
some bill needed to be paid. He testified that the accounts payable records for which
Carter was responsible indicated that various vendors had been paid, when in fact they had
not. Worthy testified that he was having problems "trying to locate why our cash flow was
so bad" ("We had plenty of sales. We just didn't have much money"). Rather than
looking at cancelled checks, he was checking the company's books by examining the
checkbook stubs, where "everything appear[ed] in order." As noted herein, Carter was
solely responsible for the checkbook during this period. 

 Worthy testified about the financial impact of the thefts on the family's business:

 We had to go borrow money. We had to . . . start letting people go and then
we started working for less wages in order to keep things afloat, but mainly
we had to go borrow money at the bank to pay our bills . . . . 


 . . . .


 I had to pay my bills out of my savings. 

 Carter's defense rests on the assertion that she was having an affair with Joe
Worthy, and that the checks were either gifts which he made to help her with living
expenses or outright payments for sex. She insisted that all of the checks had already been
made out to her when her employer signed them and that he accused her of theft to avoid
"admitting his infidelity and fiscal irresponsibility." Carter said that she began asking
Worthy for money because of her financial struggles as a single mother. She testified that
he directed her to falsify the stubs corresponding to the checks: "I'd ask him what to put
on the stub and he'd tell me what to put on the stub. He'd tell me to go find a vendor that
maybe we owed some money to and put it on there." 

 Worthy vehemently denied any sexual relationship. Carter's brief asserts that "Ms.
Carter's testimony [alleging a sexual relationship] was supported by the uncontroverted
testimony of Lori Grammer." Grammer's only pertinent testimony was that, while she
was visiting Carter at the TVC office, Worthy "asked me and Ms. Carter for a three-way." 
Grammar testified she thought by asking for a "three-way" Worthy meant "[s]exual acts
between the three of [them]." When asked if she thought he was serious, Grammer replied
"It could be yes or no on that question because of the fact -- I'm not sure." Ms. Grammar
did not testify to any personal knowledge of a sexual relationship between Carter and her
employer. On cross-examination, Grammar testified that she had lived with Carter for
approximately a year at the Windcrest Springs Apartments, and that she had never seen
Worthy at the apartment. 

 Carter also offered a description of Worthy's bedroom as corroborating evidence
of the alleged affair. She denied that she had ever been in the Worthy home under other
circumstances which would have allowed her to see the bedroom. However, Jolyn
Fontenot, Worthy's daughter, disputed this, testifying that Carter and her children had
spent a night at the Worthy home as Fontenot's guests while Joe Worthy and his wife were
out of town. Carter produced no hotel records to document her alleged hotel trysts with
Worthy, and produced no telephone records to document calls supposedly made to her by
Worthy at home or on her mobile phone. 

 Carter calls Worthy's testimony about the embezzlement "confusing and
contradictory." 

 Mr. Worthy would have the jury believe that he never had much control over
TVC's finances. However, the testimony of his daughter, wife, former
employee, and his own testimony indicate that he was very involved and
aware of all financial transactions. How can he claim he did not approve the
checks he signed for Rhonda Carter? 


 In fact, Worthy freely acknowledged that he "approved"-- and signed -- the checks
in question; he testified that he did so under the impression that the checks would be made
payable to specific vendors, rather than to Carter. Carter asserts that "Worthy admits that
he is constantly involved with TVC's finances . . . while claiming he could not find the
forty-five irregular checks to Rhonda Carter." As noted above, Worthy testified that he
did not immediately find the checks in question because he was looking for the roots of
TVC's cash flow crisis not in the cancelled checks, but in the check stubs and the
"accounts payable" records, both of which were entrusted to Carter and both of which she
allegedly falsified. 

 Worthy acknowledged financially assisting some TVC employees, but stated he did
so by giving them interest-free loans which were recorded in a ledger and which had to be
paid back. "I didn't give away any money. Too hard to come by. Everything was paid
back." This testimony was corroborated by Judy Almand, a former employee of TVC. 

 The conviction is supported by sufficient evidence. The inference that Carter
committed theft -- by persuading Worthy to sign checks on the pretext that they would be
made payable to the company's suppliers, but then making them payable to herself -- was
supported not only by the testimony of Worthy and Fontenot but by the objective evidence
of the cancelled and endorsed checks themselves, contrasted with the falsified check stubs.
There is little evidence against the jury's finding, other than Carter's protestations of
innocence. The evidence is not rendered insufficient merely because the appellant presents
a different version of events. Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). 
The jury was entitled to judge the credibility of the witnesses, and to believe all, some, or
none of the testimony presented by the parties. Chambers v. State, 805 S.W.2d 459, 461
(Tex. Crim. App. 1991). In this case, the jury's evaluation of Carter's credibility might have
been impacted further by her acknowledgment of three previous convictions for theft by
check, by her acknowledgment that she had not reported the $37,000 to the IRS, and by
testimony that Carter's reputation in the community for truth and veracity was poor. Carter's
lone point of error is overruled. 


 The judgment of the trial court is AFFIRMED.

 PER CURIAM

 

Submitted on December 19, 2001

Opinion Delivered February 6, 2002Do Not Publish


Before Walker, C.J., Burgess, and Gaultney, JJ.

1. The third check was made out to GTE; the "FOR" line reads 281-731-8037. While
a notation on the check says "Carter's phone," no separate proof of that assertion was
entered in the record.