Opinion issued July 24, 2003







            










In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-02-00383-CR
____________
 
BYRON DEMON MOORE, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 179th District Court
Harris County, Texas
Trial Court Cause No. 873,265
 

 
 
MEMORANDUM OPINION
          A jury found appellant, Byron Demon Moore, guilty of murder and assessed
his punishment at confinement for 87 years. In five points of error, appellant
contends that the evidence was legally and factually insufficient to support his
conviction and that the trial court erred in denying his motion to exclude the
testimony of two witnesses who allegedly violated “the Rule.”



          We affirm.
Facts and Procedural Background
          During the early morning hours of April 1, 2001, following an argument in the
parking lot of the apartment complex where appellant lived, appellant fatally shot the
complainant, Alan Thomas, in the face.
          Danilo Cabrera, who lives at the apartment complex, testified that he was
awakened that morning by the sound of voices arguing in the parking lot. Cabrera,
who wears glasses for reading but does not wear them to drive, testified that he
looked out his window and saw three black men. One of the men, later identified as
appellant, left the parking lot while the other men got inside a Chevrolet Suburban,
which began to back up. Appellant then returned to the parking lot carrying a
handgun and pointed the gun at the passenger side of the Suburban. Cabrera testified
that he saw a passenger, later identified as the complainant, get out of the Suburban
while appellant continued to point the gun at him. Appellant then shot the
complainant once, and the complainant fell to the ground. Cabrera testified that the
complainant did not hit or touch appellant before the shooting. Cabrera then saw
appellant “run away with the gun in his hand.”
          Malcum Evans, who also lives at the apartment complex, testified that his wife
woke him up that morning and that, when he looked out his window, he saw four
black men arguing in the parking lot. Evans testified that he saw a man, later
identified as appellant, shoving another man. Evans then saw appellant leave and
heard him say, “Be here when I get back. I’m going to smoke all of y’all.” About
two minutes later, Evans heard a white female say, “No, Byron, no.” Evans then saw
appellant return with a handgun. Appellant, with his arm extended, pointed the gun
at the passenger side of the Suburban and said, “Bitch, you mine.” A man, later
identified as the complainant, then got out of the Suburban. Appellant lowered his
arm, raised it again, and shot the complainant one time. Evans testified that the
complainant never touched or struggled with appellant at the time of the shooting.
          Embry Ball testified that he lived at the apartment complex at the time of the
shooting and was awakened by the sound of three voices arguing. Ball heard one of
the voices say, “Get your hands off me,” and, a few seconds later, heard a single
gunshot. Ball’s wife called 9-1-1.
          Houston Police Department officers arrived at the scene of the shooting and,
after questioning several witnesses, arrested appellant at his apartment. Houston
Police Officer D. C. Lambright testified that, at the time of appellant’s arrest,
appellant did not attempt to flee and did not struggle. Houston Police Sergeant W.
Allen testified that, at the apartment complex, after appellant was placed in a patrol
car, appellant, who was visibly upset, said “He shouldn’t have grabbed me.”
          Houston Police Sergeant B. Smith testified that, at the police station, he
interviewed appellant, and appellant voluntarily gave Smith two written statements
concerning the shooting.


 Smith testified that, at the beginning of the interview,
appellant “cried and showed some emotion,” and, in Smith’s opinion, appellant
displayed “genuine remorse” for what had happened. Smith described appellant’s
manner during the interview as “conversational, very lucid, quiet, but very
responsive, very cooperative.”
          Appellant’s first statement reads, in part, as follows:
Last night I was with Tyerick [sic] [Walker], Terry Burk, and [the
complainant]. . . . We were in two different cars and we were running
around going to different topless bars. . . .

          . . . .
 
We dropped Terry off to get his Suburban and [the complainant] got in
with him. We then drove to my apartment. When we got there I got out
of Tyerick’s [sic] car and walked towards Terry’s Suburban. . . . Then
[the complainant] started talking to me about a woman.
 
[The complainant] was mad at me for flirting with one of his women. 
I asked him which one and he told me “the one you flirt with.” He was
mad and cussing. I told him I was going to go in my house and that if
he wanted to fight me, he could fight me another day. He got out of the
Suburban and as I was walking toward my house, [the complainant] was
following me and cursing behind me. I told him to leave and get away
from my property. We were in the middle of the parking lot . . . . He
shoved me and he wanted to fight. I shoved him back and told him
again that I was going inside.
 
I was turning away to walk to my apartment and I saw him reaching
toward his waistline. I didn’t know what he was reaching for so I turned
around and pulled my gun and shot at him one time. We were standing
close to each other when I shot. Terry grabbed my gun away from me
and told me I didn’t need to do that. I just kept walking and went inside
my apartment.
 
About an hour or two later the cops came to my door. I went outside
and I saw [the complainant] was laying [sic] on the pavement where I
shot him. That was the first I knew that I had hit him. I thought I had
shot up in the air.

Appellant’s second written statement reads, in part, as follows:
I gave Sgt. Smith a statement earlier this morning about shooting my
friend [the complainant]. That statement was true but there were some
things I didn’t put in that statement that I want to add now.

          . . . .
 
I went outside and Tyerick [sic], [the complainant], and Terry were
there. I gave [the complainant] the Taurus 9mm. . . .
 
It was after I had given [the complainant] the 9 that we got into the
argument about the girl. . . . At some point during the argument [the
complainant] gave the Taurus back to me. I don’t remember if I took it
back into my apartment before or after I shot [the complainant]. I do
remember that I told him and everyone else to leave my property. I told
them all several times to leave, to get out, to leave me alone, that I had
kids inside. I never argued with Terry or Tyerick [sic], but I told them
all to leave.
 
Even though [the complainant] had given me the Taurus back, when he
reached towards his waistline, I didn’t know if he had a gun of his own,
a knife, or what.

          Harris County Assistant Medical Examiner Dr. Roger Milton testified that the
autopsy performed on the complainant indicated that he died as a result of a single
gunshot wound to the face. The bullet entered the complainant’s cranium at the
bridge of his nose and followed a “slightly upward” trajectory out through the back
of his head. It was Dr. Milton’s opinion, that, at the time of the shooting, the gun was
“aimed directly toward the center of the deceased’s face.” Based on a stippling
pattern of gunpowder particles observed on the complainant’s face, it was Dr.
Milton’s opinion that the gun was fired at a range of between 18 and 24 inches from
the complainant. Atomic absorption testing performed on the hands of both appellant
and the complainant was “inconclusive.”
          Tyvis Moore, appellant’s brother, testified that he witnessed the shooting in the
parking lot. After appellant and the complainant began arguing, appellant went inside
his apartment and returned to the parking lot with two guns. Appellant was holding
one gun in each hand, with his elbows bent, holding the guns “straight up in the air.” 
When appellant approached the passenger side of the Suburban, the complainant, who
was sitting inside, got out and asked appellant, “What are you going to do, take me
away from my niece, or my child?” Using both hands, the complainant then tried to
grab the gun from appellant’s right hand and said, “Give me the fucking gun.” Moore
testified that the gun in appellant’s right hand “went off,” and the complainant fell to
the ground. After the shooting, Moore screamed at appellant, “What did you do that
for?” Moore described appellant’s demeanor after the shooting as “dazed.”
          TyEric Walker testified that, at the time of the shooting, he was with the men
in the parking lot but “wasn’t really paying attention” to the argument between
appellant and the complainant. At some point, appellant went inside his apartment,
returned, and walked over to the passenger side of the Suburban. Walker did not
remember whether appellant was carrying anything in his hands when he returned to
the parking lot. After appellant returned, Walker saw appellant and the complainant
“wrestling” and holding each other by the arms and hands for about one or two
minutes. Walker then looked away to light a cigarette and heard a gunshot. When
Walker looked back, he saw the complainant fall to the ground. Walker then walked
over to the complainant’s body, saw what had happened, and left with Tyvis Moore
in Moore’s car. Walker admitted that, when he was later questioned by the police
about the shooting, he gave the false name “TyEric Moore” to “cover up” for Tyvis
Moore because he knew Tyvis was wanted for outstanding warrants. Walker also
testified that, in his opinion, all of the men in the parking lot that evening were
intoxicated.
          Terry Burks testified that he was the driver of the Suburban in the apartment
complex parking lot on the night of the shooting. After appellant and the complainant
began arguing, appellant left the parking lot and went to his apartment. When Burks
and the complainant got into the Suburban, appellant returned and pointed two guns
at the Suburban. The complainant then got out of the Suburban on the passenger side,
and Burks got out on the driver’s side. Burks saw appellant and the complainant
talking face-to-face “within arm’s reach of each other.” Appellant was still holding
the guns; “One was about 9:00 o’clock, and one was about 1:00 or 2:00 o’clock.” 
Burks heard, but did not see, the fatal gunshot. Before the gunshot, Burks did not see
the complainant make any movement toward appellant, and appellant and the
complainant were “just standing there.” Burks did not see appellant extend either arm
toward the complainant in a horizontal position. When he heard the gunshot, Burks
ducked behind the Suburban, and when he stood up, he saw the complainant lying on
the ground. Appellant was standing over the complainant’s body, apologizing. 
Appellant then put a gun up to his own head, but Burks told him to “just calm down”
and took the gun from appellant.
          Appellant testified that he had known the complainant for about five years and
thought of him as “my little brother.” After an evening of drinking, appellant and the
complainant, Tyvis Moore, Terry Burks, and TyEric Walker returned to the parking
lot of the apartment complex where appellant lived. Appellant and the complainant
then began to argue about the complainant’s accusation that appellant had been
“flirting” with the complainant’s girlfriend. When appellant attempted to reconcile
with the complainant by giving him a hug, the complainant pushed appellant away,
and the two men “shoved each other a couple of times.” Appellant then told all of the
men to “get the fuck off my property” and went inside his apartment. Appellant
testified that, at the time he went inside, he had two 9 millimeter pistols, one tucked
in the front waistband of his pants and the other tucked in the back waistband.
          Appellant further testified that he subsequently came out of his apartment
carrying the two guns, one in each hand, with his arms bent at the elbows, pointing
the guns up. Appellant testified that he did not check to see if the guns were cocked
or if their safety mechanisms were engaged. Appellant denied pointing the guns at
the Suburban. When appellant approached the passenger side of the Suburban, the
complainant continued to accuse him of “flirting” with the complainant’s girlfriend,
and the complainant then “jumped out” of the Suburban. The complainant
subsequently “lunged” at appellant and, with both hands, grabbed appellant’s right
hand. Appellant testified that the next thing he remembered was “the gun going off.” 
Appellant denied that he intended to fire the gun or kill the complainant.
          Appellant testified that, as a result of the shooting, his mental state at the police
station was “blank,” and he was not thinking clearly. Appellant described his feelings
at the time of his written statements as “tired,” “hysterical,” and “mentally unstable,”
and he testified that, at the time he signed his statements, he was “not in my right
frame of mind.”
          The jury subsequently returned a general verdict, finding appellant guilty of
murder “as charged in the indictment.”
Sufficiency of the Evidence
          In his first and second points of error, appellant argues that the evidence was
legally and factually insufficient to show that he “intentionally and knowingly caused
the death of the complainant.” See Tex. Pen. Code Ann. § 19.02 (Vernon 2003). In
his third and fourth points of error, appellant argues that the evidence was legally and
factually insufficient to show that he intended to and did cause the complainant’s
death by “intentionally and knowingly committing an act clearly dangerous to human
life.” Id.
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine if any rational fact finder could have
found the essential elements of the crime beyond a reasonable doubt. King v. State,
29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Although our analysis considers all
evidence presented at trial, we may not re-weigh the evidence and substitute our
judgment for that of the fact finder. Id.
          The factual sufficiency of the evidence is reviewed by examining all of the
evidence neutrally and asking whether the evidence, both for and against the finding,
demonstrates that the proof of guilt is so obviously weak as to undermine confidence
in the jury’s determination, or the proof of guilt, although adequate if taken alone, is
greatly outweighed by contrary proof. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000).
          Here, the State presented evidence, set forth above, in the form of testimony
from lay and expert witnesses and written statements signed by appellant, sufficient
to permit a rational jury to conclude beyond a reasonable doubt that appellant
“intentionally and knowingly” shot and killed the complainant. Danilo Cabrera and
Malcum Evans both testified that they saw the shooter point a handgun at the
passenger side of the Suburban, and Evans heard appellant say “Bitch, you mine.” 
When the complainant got out of the Suburban, both Evans and Cabrera saw
appellant shoot the complainant without any struggle. Dr. Milton testified that it was
his opinion that the gun was aimed at the center of the complainant’s face and was
fired from 18 to 24 inches from the complainant. We hold that, viewed in the light
most favorable to the verdict, the evidence was legally sufficient to support a finding
by the jury that appellant intentionally and knowingly caused the complainant’s
death. Similarly, we hold that the evidence was legally sufficient to support a finding
by the jury that appellant caused the complainant’s death by intentionally and
knowingly committing an act clearly dangerous to human life.
          We overrule appellant’s first and third points of error.
          In regard to the factual sufficiency of the evidence, appellant notes that he
testified that he did not point his gun at the Suburban and the complainant jumped out
of the Suburban and “lunged” at him. Appellant testified that he did not intend to
shoot the complainant and that his gun “went off involuntarily” while the complainant
struggled with him. He points to the testimony of Moore, Walker, and Burks to
corroborate his version of the shooting. He also directs us to various inconsistencies
in the testimony of the State’s witnesses.
          However, viewing all of the evidence neutrally, we hold that an examination
of the record does not demonstrate that the proof of guilt was so obviously weak as
to undermine confidence in the jury’s determination, or that the proof of guilt was
greatly outweighed by contrary proof. Although often contradictory, the evidence
presented at trial was not one-sided, and the jury, as fact finder, was entitled to
resolve conflicts in the evidence against appellant. Cain v. State, 958 S.W.2d 404,
408-09 (Tex. Crim. App. 1997) (“What weight to give contradictory testimonial
evidence is within the sole province of the jury because it turns on an evaluation of
credibility and demeanor.”). A jury decision is not manifestly unjust merely because
the jury resolved conflicting views of evidence in favor of the State. Id at 410.
          Accordingly, we hold that the evidence was factually sufficient to support a
jury finding that appellant intentionally and knowingly caused the complainant’s
death. In addition, we hold that the evidence was factually sufficient to support a jury
finding that appellant caused the complainant’s death by intentionally and knowingly
committing an act clearly dangerous to human life.
          We overrule appellant’s second and fourth points of error.
Violation of “the Rule”
          In his fifth point of error, appellant argues that the trial court erred in
permitting two witnesses to testify after it was established that they had violated the
trial court’s instruction that, during the trial, they were not to listen to the testimony
of other witnesses or discuss the case with anyone. See Tex. R. Evid. 614.
          During the course of trial, on appellant’s request, the trial court conducted a
hearing outside the presence of the jury to determine whether any witnesses had
violated Rule 614. At this hearing, Christine Hamilton, the complainant’s girlfriend,
testified that, during the trial, she was waiting in the hallway outside the courtroom
near two other witnesses, Alondria Brewer and Anthony Thomas. As they were
waiting to testify, Alisa Thomas, the complainant’s sister, came out of the courtroom
during Danilo Cabrera’s testimony. Alisa Thomas, who was not sworn in as a witness
and did not testify, then described Cabrera’s testimony to Alondria Brewer and
Anthony Thomas concerning where and how appellant was standing and holding the
gun at the time of the shooting. According to Hamilton, Thomas said that Terry
Burks had “lied” with regard to how the shooting occurred. Hamilton testified that
she did not respond to Thomas’s statements.
          Alondria Brewer, a friend of the complainant and Terry Burks’s girlfriend,
testified that, after she heard Thomas’s comment that Terry Burks had “lied” about
how the shooting occurred, Brewer became defensive and moved to another part of
the hallway because Burks was her boyfriend. Brewer testified that she did not hear
anything else Thomas may have said concerning the trial testimony.
          The record supports appellant’s contention that the witnesses complained of
violated Rule 614. We review the trial court’s decision to permit the testimony of a
witness who has violated the rule for abuse of discretion. Bell v. State, 938 S.W.2d
35, 50 (Tex. Crim. App. 1996). In reviewing the trial court’s decision to allow the
testimony, we look at whether or not the defendant was harmed or prejudiced by the
witness’s violation by focusing on two criteria: (1) whether the witness actually
conferred with or heard testimony of other witnesses, and (2) whether the witness’s
testimony contradicted the testimony of a witness from the opposing side or
corroborated testimony of a witness he had conferred with or heard. Id.
          Appellant argues that both Brewer and Hamilton testified that they were told,
at the scene of the shooting, that appellant shot the complainant. Appellant argues
that this testimony gave the jury the false impression that appellant intentionally, not
accidentally, shot the complainant. However, at trial, as noted above, appellant did
not contest the fact that he shot the complainant. Here, both of the witnesses
challenged by appellant testified that they did not see the shooting and did not discuss
the shooting with appellant. Neither of the witnesses testified about the specifics of
the shooting itself and did not contradict or corroborate the testimony of any of the
witnesses to the shooting. Based on the record, we cannot conclude that appellant
was harmed or prejudiced by the witnesses’ violation of the rule. Accordingly, we
hold that the trial court did not abuse its discretion in permitting Brewer and
Hamilton to testify.
          We overrule appellant’s fifth point of error.
 

Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Taft, Jennings, and Hanks.

Do not publish. Tex. R. App. P. 47.2(b).