Affirmed and Memorandum Opinion filed July 17, 2008








Affirmed and Memorandum Opinion filed July 17, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-07-00051-CR

_______________

 

FLOYD ATKINS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                                                               


On Appeal from the 208th District Court

Harris County, Texas

Trial Court Cause No. 1060630

                                                                                                                                               


 

M E M O R A N D U M  O P I N I O N

A jury
found appellant, Floyd Atkins, guilty of theft of property with a value over
$20,000 and under $100,000.  After finding two enhancement paragraphs were
true, the trial court sentenced appellant to thirty years= confinement.  In four issues,
appellant contends the evidence is legally and factually insufficient to
support the conviction.  All dispositive issues are settled in law. 
Accordingly, we issue this memorandum opinion and affirm.  See Tex. R.
App. P. 47.4.

 








Background

Atkins
was accused of stealing twenty-four aluminum billets owned by Nolan Williamson,
Vice President of Dressing Stevedoring and Company (ADressing@).[1] 
The billets were removed from the Port of Houston, and the police eventually
found and seized them at Northside Welding in Harris County.

The Billets= Passage

In
November 2005, Dressing received a shipment of aluminum billets at the Port of
Houston.  The billets were unloaded and stored on City Dock 32A.  Each billet
contained a pink color code and a heat number.  A gate surveillance video taken
between12:06 p.m. and 2:06 p.m. on December 19, 2005 showed a Ared to maroon@ or Amaroonish . . . brown@ tractor trailer, loaded with billets
leaving the Port.

Sometime
in December 2005, Earl Grant and another man approached Sterling Newton, owner
of Ster-Tech Welding, about cutting some aluminum billets.  Newton had known
Grant who lived in the neighborhood for about ten years.  Before December 2005,
Newton did not know Atkins by his actual name.  However, Newton knew Atkins as ABig Bo@ from seeing him in the neighborhood
and subsequently identified Atkins=s photograph as that of the man he
saw with Grant.

According
to Newton, Atkins offered Newton $5,000 to cut the aluminum and presented a
document he claimed to be a bill of sale for the billets.  The document listed
the commodity as A24@ aluminum Abillads.@  The document also contained a ACooper/T. Smith Stevedoring@ heading and showed delivery to ACollman Trucking@ from SS AEndevor.@  It was date stamped A05 DEC 19 PM 1:06 GATE A.@








Atkins,
Grant, and Asome old guy@ delivered the aluminum to Newton.  Atkins was driving the
big truck, and Grant and the other man were in a pickup.  According to Newton,
Atkins was Arunning the show@ with the aluminum.

Newton
was unable to cut the billets himself, and the billets remained in his driveway
for a week or week and a half.  While the billets were in Newton=s driveway, Atkins returned several
times to determine whether Newton had finished cutting them.  Newton eventually
subcontracted the work to Northside and delivered the billets there.

Charlie
Marsh owned Northside Welding Supply, as well as a nearby fabrication shop and
construction business.  In December 2005, Newton came to the fabrication shop and
asked to have some billets cut.  When Charlie=s brother, Daniel, first saw the
billets, he was concerned they might be stolen because of the configuration and
number of billets.  Daniel told Newton to be sure he had a bill of sale for
them, but Daniel never saw one.  According to Daniel, they succeeded in cutting
two or three billets.

Sean
McDaniel, son-in-law of Northside=s owners and a Northside Welding
Supply employee, recalled some aluminum billets coming to the fabrication
shop.  In mid-December 2005, a man McDaniel subsequently identified as Atkins
came looking for his aluminum billets.  When McDaniel told Atkins that anything
having to do with the aluminum was at the fabrication shop, Atkins, Ajust quoted to me, >Well, it best be down there or,= you know, >or else.=  I said, >What do you mean or else?  Is that a
threat or what?= He said, >No, basically it=s a promise that I want my aluminum.=@








Linda
Marsh, Charlie=s wife and co-owner of Northside Welding Supply, thought her husband had
initially given Newton a price for cutting three billets.  When another truck
brought the total to twenty-four, Linda did not feel comfortable cutting any
more.  Additionally, a man had intimidated one of her employees at the fabrication
shop.  Linda called the shop and informed her employees that, when Newton
called again, she wanted to talk with him.  Newton came a little while later,
and Linda told him, if he could not pick up the billets and show her a bill of
sale, she intended to call the police, Abecause this is way too much stuff.@  According to Linda, Newton left and
called the police.

On the
day the police seized the billets, Kevin Shaw, an employee of Northside Welding
Supply, saw a man he subsequently identified as Atkins talking with Newton in
front of the welding supply shop.  According to Shaw, Newton called Shaw over
and asked him to tell Atkins what the police were doing.  When Shaw told Atkins
the police were loading the billets because they said they were stolen, Atkins
did nothing.  However, according to McDaniel, on the night the police seized
the billets, Atkins was Aasking about the stuff . . . was saying that Sterling
[Newton] was taking it from him and we told him no, that it was down the
street, that Officer Manning was down there and that the police was [sic]
taking the billets.@  McDaniel and Shaw told Atkins, A>Well, if you have a bill of sale go
down there. The officer=s down there, show him the bill of sale and tell him that it=s not stolen and there should be no
problems.=  And he left.@

The Investigation

Shortly
before the seizure of the aluminum billets, Officer Jeff Manning of the auto
theft division of the Harris County Sheriff=s Department, had been investigating
the theft of copper cathodes.  At one point, the copper had been delivered to
Newton=s shop, and Manning questioned three
men who were later found in possession of the copper and who Ahung out@ at Newton=s shop.  Manning gave them his
business card and told them, if they were in contact with Newton, to instruct
him to call Manning.  Newton called Manning that night, December 22, 2005, and
subsequently gave a statement to police on December 27, 2005.  Newton did not
mention the aluminum in that statement.








On
December 30, 2005, Newton contacted Manning about the aluminum.  Initially,
Manning showed Newton photographic spreads containing photographs of Earl Grant
and Rodney Brooks, who was the registered owner of a truck Newton said belonged
to ABig Bo.@ After Newton identified Grant=s, but not Brook=s, photo, Manning learned Atkins
might be the man Newton called ABig Bo.@  He then put Atkins=s photo in a spread, and Newton
identified Atkins as ABig Bo, the guy who brought me the aluminum.@

Shaw
identified Atkins=s photo as that of the man who came by the welding shop
asking about  the aluminum at the other shop (i.e., the fabrication shop). 
McDaniel identified Atkins=s photograph as that of the man who questioned him about the
aluminum pipe at the shop and who was at the welding supply shop the night the
police seized the aluminum.

Newton
gave Manning a pass-out slip, which Atkins previously told Newton was a Abill of sale@ to show the aluminum was not stolen.[2] 
The slip was date stamped A05 DEC 19 pm 1:06.@  The slip indicated the cargo was
twenty-four aluminum Abillads.@[3]

Manning
spoke with several people who dealt with aluminum billets and eventually  spoke
to Williamson.  After Manning sent Williamson photographs, the heat numbers,
and the markings of the billets seized from Northside, Williamson identified
the billets as belonging to his company.  The billets would have been unloaded
at the port by November 23, 2005.








Manning
also visited Atkins=s trucking company at 5228 Tidwell, the address Newton said
he associated with the business owned by ABig Bo.@  While there, Manning spoke with
Atkins and observed several tractors and trailers on the premises.  Two
Peterbilt tractors had TKB Express insignia on them.  One was red; the other
was brown.

Port of
Houston Police Sergeant Cheryl Johnson searched the port=s pass-out slips from November 19,
2005 through December 19, 2005 and gave Manning all TKB Express slips generated
during that period of time.  After reviewing the port=s logs, Manning concluded that two
TKB Express trucks were at the port on December 19, 2005.  The Port of Houston
police also contacted the trucking company and confirmed this information. 
Johnson then obtained surveillance videos from one hour before to one hour
after the time stamped on the pass-out slip Newton had given Manning.  One of
the videos showed a truck  leaving with twenty-four aluminum billets.  The
tractor trailer was Ared to maroon@ or Amaroonish . . . like a brown.@[4]

Analysis

In his
first and second issues, respectively, Atkins contends the evidence is legally
and factually insufficient to support his conviction.  In his third and fourth
issues, respectively, Atkins contends the evidence is legally and factually
insufficient to support his conviction as a party to the offense.








In
considering a legal-sufficiency challenge, we review all evidence in the light
most favorable to the finding and determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable
doubt.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  In
examining a factual-sufficiency challenge, we view all evidence in a neutral
light and set aside the verdict Aonly if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.@ Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997) (quoting Clewis v. State, 922 S.W.2d
126, 129 (Tex. Crim. App. 1996)).  Before we may reverse for factual
insufficiency, we must first conclude with some objective basis in the record,
that the great weight and preponderance of the evidence contradicts the jury=s verdict.  Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006).  As the court of criminal appeals
recently explained:

Both legal and factual sufficiency standards require the reviewing
court to consider all of the evidence.  AThe
difference between the two standards is that the former requires the reviewing
court to defer to the jury=s credibility
and weight determinations while the latter permits the reviewing court to
substitute its judgment for the jury=s
on these questions >albeit to a very limited degree.=@ In reality, a Afactual‑sufficiency
review is >barely distinguishable= from a Jackson v. Virginia legal sufficiency review.@

 

Rollerson v. State, 227 S.W.3d 718, 724 (Tex. Crim.
App. 2007) (citations omitted).

A person
commits the offense of theft Aif he unlawfully appropriates property with intent to deprive
the owner of property.@  Tex. Pen. Code Ann. ' 31.03(a) (Vernon Supp. 2007).  AAppropriation of property is unlawful
if:  (1) it is without the owner=s effective consent; [or] (2) the
property is stolen and the actor appropriates the property knowing it was
stolen by another . . . .@  Id. ' 31.03(b)(1), (2).  Atkins argues the evidence is
insufficient to establish he committed the offense, either by his own conduct
or as a party.

Although it is axiomatic the State must prove beyond a
reasonable doubt that the accused is the person who committed the charged
crime, the State may prove identity with direct or circumstantial
evidence.  Smith v. State, 56 S.W.3d 739, 744 (Tex. App.C Houston [14th
Dist.] 2001, pet. ref=d).  We do not subject proof of identity
through circumstantial evidence to a more rigorous
standard than we do proof by direct evidence.  Id. 








AA person is criminally responsible as a party to an offense
if the offense is committed by his own conduct, by the conduct of another for
which he is criminally responsible, or by both.@  Tex. Pen. Code Ann. ' 7.01(a) (Vernon 2003).  A person is
criminally responsible for an offense committed by another=s conduct if Aacting with intent to promote or
assist the commission of the offense, he solicits, encourages, directs, aids,
or attempts to aid the other person to commit the offense. . . .@  Id. ' 7.02(a)(2).

A>In determining whether the accused
participated as a party, the court may look to events occurring before, during
and after the commission of the offense, and may rely on actions of the
defendant which show an understanding and common design to do the prohibited act.=@  Ransom v. State, 920 S.W.2d
288, 302 (Tex. Crim. App. 1994) (quoting Cordova v. State, 698 S.W.2d
107, 111 (Tex. Crim. App. 1985)).  The State may prove party status with circumstantial
evidence.  Id.

Mere
presence at the scene of the offense does not establish guilt as a party to the
offense.  Porter v. State, 634 S.W.2d 846, 849 (Tex. Crim. App. [Panel
Op.] 1982).  Presence at the scene, however, is a circumstance tending to prove
guilt which, when combined with other facts, may suffice to show that the
accused was a participant.  Valdez v. State, 623 S.W.2d 317, 321 (Tex.
Crim. App. [Panel Op.] 1979).  However, although flight alone will not support
a Aguilty@ verdict, evidence of flight from the
scene of the offense is a circumstance from which an inference of guilt may be
drawn.  Id.  Finally, evidence that a defendant had the personal,
unexplained possession of recently stolen property is sufficient to raise a
presumption or inference of guilt and to sustain his conviction for theft of
that property.  Joseph v. State, 3 S.W.3d 627, 641 (Tex. App.CHouston [14th Dist.] 1999, no pet.). 
A defendant=s actions, including his verbal assertions of exclusive ownership or
right to stolen property, may show a conscious assertion of the right to the
stolen property, thus proving exclusive personal possession of that property.  
See Louis v. State, 159 S.W.3d 236, 247 (Tex. App.CBeaumont 2005, pet. ref=d).

The
following evidence supports the conclusion that Atkins, by his own conduct, or
by assisting Grant, or both,[5] committed the
theft of the aluminum billets:








$                  
(a) Williamson=s testimony that someone who knew the
Port of Houston system would be able to load a flatbed truck with material and
drive it out of the port; and (b) Atkins=s sister=s testimony that Atkins knew how to
get in and out of the port;

$                  
(a) the
surveillance video of the port gate showing a Ared to maroon@ or Amaroonish . . . brown@ truck with aluminum billets leaving
December 19, 2005; (b) evidence that December 19, 2005 was the date stamped on
the pass-out slip Atkins told Newton was a bill of sale for the billets; and
(c) Manning=s observation of red and brown tractor trailer trucks at Atkins=s business after the theft;

$                  
(a) Manning=s testimony that he observed two
trucks, one red and one brown, with TKB Express insignia at Atkins=s business; and (b) Johnson=s testimony that invoices from TKB
Express showed two trucks at the port on December 19, 2005;

$                  
(a) Newton=s testimony that (i) a person
he later identified as Atkins offered him $5,000 to cut the aluminum, (ii)
Atkins returned several times to see whether Newton had finished cutting it,
and (iii) after the billets sat outside his shop for a few days, Newton
subcontracted with Northside Welding to cut the billets and took them to
Northside; and (b) Williamson=s testimony that, based on color codes and heat markings, the
billets at Northside were billets missing from his inventory;

$                  
(a) Newton=s identification of Grant as the
person with Atkins when Atkins brought Newton the billets; and (b) Grant=s plea of Aguilty@ to the theft of the billets;








$                  
Newton=s testimony that Atkins had the
aluminum and Newton was having it cut for Atkins; and

$                  
McDaniel=s testimony that (a) a man he
identified as Atkins asked where his aluminum was and, after being told, said, Ait best be down there or . . . else,@ (b) Atkins had claimed ownership of
the aluminum, and (c) when McDaniel told Atkins to show the bill of sale to the
officers seizing the aluminum, Atkins left.

We conclude this evidence
is legally sufficient to establish Atkins committed the offense of theft of the
aluminum billets, either acting alone or in combination with Grant.

Atkins,
however, argues that Newton was the only witness to link him to the stolen
billets and that Newton=s status as a parolee, the timing of Newton=s statement to Manning, and
contradictions in  Newton=s  actions and testimony undercut his credibility as a
witness.  Atkins also points to Shaw=s explanation of Atkins=s Ait best be down there@ statement and to Shaw=s testimony that, despite seeing
Atkins speaking to Newton the night the police seized the billets, he never
overheard Atkins claim ownership of the billets.  Atkins argues that his mere
presence at the scene is weak evidence of any alleged intent to steal or
possess the aluminum and contends the investigation is incomplete.  Finally,
Atkins directs this court=s attention to Grant=s testimony that Atkins had no
involvement in the incident.[6]








Atkins=s complaints are directed at the jury=s weight and credibility
determinations; and, in conducting a legal-sufficiency analysis, we defer to
those determinations.  See Rollerson,  227 S.W.3d at 724.  Additionally,
we may substitute our judgment for that of the jury only to a very limited
degree when we conduct a factual-sufficiency review.  See id.  Given
what we consider to be overwhelming circumstantial evidence linking Atkins to
theft of the aluminum, we decline to overturn the jury=s verdict in this case.

We
conclude the evidence is legally and factually sufficient to support the jury=s verdict.  Therefore, we overrule
appellant=s four issues.

The judgment of the trial court is affirmed.

 

 

 

/s/        Charles
Seymore

Justice

 

Judgment rendered and
Memorandum Opinion filed July 17, 2008.

Panel consists of
Justices Fowler, Frost, and Seymore.

Do Not Publish C Tex. R. App. P. 47.2(b).

 









[1]  A billet is a piece of metal, such as aluminum, in
raw form, after scrap metal has been melted and ingredients added.  The billets
in the present case were twenty to twenty-five feet long, and their total
weight would have been around forty thousand pounds.





[2]  A pass-out slip, or gate slip, is issued by the
entity allowing cargo to be removed from the port by a specific transportation
or trucking company or individual.  The pass-out slip contains the name of the
company handling the cargo and a brief description of the cargo that should be
on the truck when it leaves the port.





[3] The pass-out slip was on a Cooper/T. Smith
Stevedoring Company form.  Endeavor, the ship indicated on the pass-out
slip, had been in port September 22, 2004 and had docked fourteen miles from
where the aluminum billets were taken.  AEndeavor@ and Abillets@ were misspelled.  Williamson testified the only thing
he knew was real on the pass-out slip was the date stamp.





[4] From the video, the officers could not identify
Atkins as the driver of truck or determine whether the TKB insignia was on the
truck.





[5]  The jury was charged in the disjunctive on the State=s two theories of how Atkins committed the theft,
i.e., by his own conduct or by assisting Earl Grant and/or other persons.





[6]  On appeal, Atkins presents the theory that Newton
was the primary actor in the theft of the aluminum and implicated Atkins to
avoid his own prosecution.  At trial, Atkins contended the other two key actors
were McDaniel and Shaw.