AFFIRM; Opinion issued October 31, 2012.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-11-01298-CR

## RIGOBERTO GUERRERO, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

### On Appeal from the 15th Judicial District Court
### Grayson County, Texas
### Trial Court Cause No. 059446

## OPINION

Before Justices Moseley, Fillmore, and Myers
Opinion By Justice Fillmore

A jury convicted Rigoberto Guerrero, Jr. of injury to a child and assessed punishment of fifty years' imprisonment and a $10,000 fine. In one issue, Guerrero asserts the evidence is insufficient to support the conviction. We affirm the trial court's judgment.

### Background

In August 2009, Guerrero, his girlfriend, Lydia Spurgeon, and the couple's two children, two-year-old J.G. and five-month-old M.G., were living with Lydia's parents, James and Cheryl Spurgeon. During the week, Cheryl was the primary caregiver for J.G., while Guerrero was the primary caregiver for M.G. Guerrero did not like either Cheryl or James and kept M.G. in the bedroom for most of the day.

On Monday, August 24, 2009, M.G. was seen by Dr. Jill Breeze for a well-baby examination and received several vaccinations. Breeze described M.G. as "happy and healthy" during the visit. She noted no bruising or other injuries to M.G. According to Lydia, after receiving the vaccinations, M.G. was "fussy."

On Tuesday, August 25th, James got off work from his full time job with the City of Sherman at approximately 4:00 p.m. and immediately went to his evening job. Lydia's grandmother picked up Cheryl at approximately 8:30 p.m. Lydia dressed J.G. and M.G. in new pajamas for her grandmother's visit and did not notice anything wrong with M.G. when she changed him. According to Lydia, M.G. was moving his left arm on Tuesday evening.

Lydia was expecting her sister and brother-in-law, Lisa and Jeremy Bullock, for dinner on Tuesday. Lydia testified that Guerrero went to a friend's house because he did not want to see Lisa and Jeremy. Because Lydia was having difficulty preparing dinner while watching the two children, she requested Guerrero come home and assist her in getting M.G. to bed. Guerrero came home at approximately 9:45 p.m. and put M.G. to bed. Guerrero then returned to his friend's house. After James finished work at approximately 10:00 p.m., he picked Cheryl up and the two arrived home at approximately 10:20 p.m. James immediately went to bed. Guerrero returned at approximately 10:30 p.m. and ate dinner in the dining room. Lisa and Jeremy arrived at approximately 11:00 p.m., and J.G. was put to bed with James shortly after their arrival. Soon after Lisa and Jeremy arrived, Guerrero went into the bedroom that he and Lydia shared with M.G.

Some time later, Lisa, Lydia, Jeremy, and Cheryl heard a "real major," piercing cry from M.G. According to Lydia, it was a different cry from the fussiness that M.G. had exhibited since getting his vaccinations. Lydia went to check on M.G. and saw Guerrero holding him. Guerrero said he was calming M.G. down and had everything under control. Lydia returned to the living room.

Lisa and Jeremy left at approximately 12:15 a.m. without seeing M.G. Cheryl then went into the bedroom with James and J.G., and Lydia went into the bedroom with Guerrero and M.G.

On Wednesday, M.G. woke up around 6:30 a.m., and Lydia prepared a bottle for him. Guerrero indicated he would feed M.G. and Lydia could go back to sleep. Lydia found this unusual because Guerrero generally did not volunteer to care for M.G. that early in the morning. After being fed, M.G. went back to sleep. James woke up at approximately 6:45 a.m., but went back to sleep on the living room couch. Lydia and Guerrero left at 9:45 a.m. for a meeting at J.G.'s new preschool. Cheryl and J.G. got out of bed at approximately 10:15 a.m. M.G. woke up at about the same time, and James got him from his crib. M.G. was crying constantly. Although James changed M.G.'s diaper and attempted to feed M.G., he continued to cry. James thought M.G. was having a reaction to the vaccinations. He called Lydia and asked her to buy some Children's Tylenol and indicated he thought M.G. needed to see a doctor. Cheryl then changed M.G.'s clothes in preparation for the visit to the doctor's office. M.G. cried constantly while Cheryl changed his clothes.

When Guerrero and Lydia put M.G. into the car for the trip to Breeze's office, they noticed he was not using his left hand. Breeze ordered an x-ray of M.G.'s arm. The x-ray showed M.G. had a broken humerus in his left arm and two broken ribs. In Breeze's opinion, the broken humerus occurred within twelve hours of M.G. arriving at her office. According to Breeze, it takes a significant force to break the humerus. The break, along with the rib fractures, caused her to suspect abuse as the cause of the injuries. Breeze instructed Guerrero and Lydia to take M.G. to Children's Medial Center.

Dr. Suzanne Dakil testified that, in August 2009, she was a pediatrician working in the Referral and Evaluation of At Risk Children program at Children's and evaluated M.G. at the

-3-

hospital. According to Dakil, the break of M.G.'s humerus had occurred within a "day or two" because there was no healing shown on the x-ray. The x-ray also showed healing fractures of the right lateral second through sixth ribs and of the left lateral second through fourth and sixth and seventh ribs. These healing fractures were probably ten to fourteen days old. On September 9, 2009, additional x-rays were taken of M.G. These x-rays showed two additional healing fractures of the left eighth and ninth ribs. According to Dakil, these fractures were likely very new when M.G. was admitted into the hospital on August 26th and could not be seen until they had begun to heal. The two new fractures could have occurred at the same time as the broken arm. Dakil testified there were twelve total rib fractures that occurred at two different times.

Dakil testified a baby handles pain better than an adult. However, an infant will not tolerate the movement of a fracture. Dakil assumes the baby feels acute pain at the time the fracture occurs. However, if the baby is placed in a position where he is not moving, the baby will be fine until the fracture is moved again. If an adult is holding the baby or changing a diaper or clothes, the pain will be exquisite and the "child will let you know." However, if the adult lays the baby down, the baby will be fine.

Dakil testified a broken humerus is a very rare injury and, in children under nine months of age, is almost always caused by abuse. Either a direct perpendicular blow to the arm or a direct bending of the arm is necessary to cause a transverse fracture of this long bone. Generally, the rib fractures are caused by compression, such as squeezing the ribs or pushing the ribs against a hard surface. The ribs are not easy to break and a "good force" is necessary to cause the fractures. Dakil would not expect to see a broken humerus or broken ribs from a baby being dropped onto the floor. In Dakil's opinion, M.G.'s injuries were not accidental. Further, a two-year-old child could not have inflicted the injuries. Lydia, James, Cheryl, Lisa, and Jeremy all denied hurting M.G.

-4-

## Analysis

In one issue, Guerrero asserts the evidence is insufficient to establish when M.G. was hurt or that Guerrero caused the injuries. Guerrero specifically relies on evidence M.G. had been "fussy" for several days and that many people had access to M.G. on a regular basis, including Cheryl and James. Guerrero points out that Cheryl and James were caring for the child on Wednesday morning when the injury was discovered and "it is just as plausible that their access caused this injury."

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 1763 (2012). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

There was no direct evidence of when and how M.G. was injured. However, M.G. was not injured when Breeze examined him on Monday, August 24th. When Lydia changed M.G.'s clothes on Tuesday evening, she did not notice anything wrong with M.G. Further, according to Lydia, M.G. was using his left arm on Tuesday evening before he was put to bed. Lydia, Lisa, Jeremy, and Cheryl all testified they heard M.G. give a sharp cry between 11:00 p.m. and 12:00 a.m. on Tuesday evening when Guerrero was alone with M.G. On Wednesday morning, M.G. began crying inconsolably when he woke up. Although James and Cheryl were caring for M.G. on Wednesday morning, neither was alone with him for a significant period of time. Further, both James and Cheryl denied they hurt M.G. on Wednesday morning. When Breeze saw M.G. on Wednesday afternoon, she determined he had a broken left arm. In Breeze's opinion, the break occurred within twelve hours of her examination of M.G. Dakil testified the break of M.G.'s arm occurred within a day or two of her examination of M.G. Further, M.G.'s ribs had been broken on two occasions. According to Dakil, a significant amount of force was necessary to cause both the broken humerus and the broken ribs.

The jury heard all the testimony. It was the role of the jury "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames*, 353 S.W.3d at 860. Reviewing all the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could have found beyond a reasonable doubt that M.G. was injured on Tuesday night and that Guerrero caused the injuries. *See Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. We resolve Guerrero's sole issue against him.

ROBERT M. FILLMORE
JUSTICE

Do Not Publish
Tex. R. App. P. 47

111298F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RIGOBERTO GUERRERO, JR., Appellant

No. 05-11-01298-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 15th Judicial District Court of Grayson County, Texas. (Tr.Ct.No. 059446).
Opinion delivered by Justice Fillmore, Justices Moseley and Myers participating.


Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered October 31, 2012.

ROBERT M. FILLMORE
JUSTICE