

# NUMBER 13-22-00429-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ALFREDO AVALOS II
A/K/A ALFREDO AVALOS,                                    Appellant,

v.

THE STATE OF TEXAS,                                           Appellee.

## On appeal from the 404th District Court
## of Cameron County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Silva, and Peña
### Memorandum Opinion by Justice Longoria

Appellant Alfredo Avalos II a/k/a Alfredo Avalos was convicted of two counts of misuse of official information, for which he was sentenced to three years' incarceration, probated for a period of four years, and given a fine of $1,000. *See* TEX. PENAL CODE ANN. § 39.06(b). Appellant argues on appeal that (1) there was insufficient evidence to support

his conviction; and (2) § 39.06(b) in conjunction with § 39.06(d) of the Texas Penal Code is "unconstitutionally vague on its face." We affirm.

## I. BACKGROUND

The State of Texas indicted appellant on two counts of misuse of official information, alleging that appellant used his official capacity as a police officer to obtain information related to two different vehicles located at a home in Cameron County. *See id.* The indictment specifically alleged that appellant acted:

> with intent to obtain a benefit and harm and defraud another, intentionally or knowingly use[d] for a non-governmental purpose information to which [appellant] had access because of [appellant's] office and employment as a public servant, namely, Lieutenant with the Bishop Police Department, and which information had not been made public . . . .

At trial, the State presented Virginia Aguirre who testified that she and appellant met in 2012 when they were both security guards for the same company. When they first met, appellant was married, but soon thereafter he informed Aguirre that he was separated from his wife. They began dating and she and appellant moved in together in 2014. Aguirre testified that the relationship was "on and off" because appellant "would go back" to his wife. Around May of 2015, Aguirre learned she was pregnant with appellant's child. In August 2015, Aguirre testified that appellant moved out of their apartment, and she found a new place to live. They had a "very rocky" relationship, but appellant eventually moved in with her again.

Appellant later began working for the Bishop Police Department (BPD) and the couple resided in Kingsville together. At some point in 2019, Aguirre and appellant separated, and Aguirre moved away from Kingsville back to the Rio Grande Valley with

2

their son. Aguirre then began dating David Hernandez. Aguirre explained that there was a time that appellant told her he tried to look up Hernandez's license and could not find it. According to Aguirre's testimony, she never told appellant that Hernandez was a threat to either her or her son. She testified that Hernandez was neither violent nor aggressive toward her or her son.

On October 20, 2019, she and appellant were meeting to exchange their son after visitation with appellant. Aguirre testified that appellant informed her that he wanted to speak with Hernandez because of Hernandez's involvement in their son's life. According to Aguirre, appellant wanted to confront Hernandez because he felt that Hernandez was "playing" Aguirre and their son—referring to the fact that Hernandez was married to someone else and was supposedly not taking the relationship with Aguirre seriously. Aguirre directed appellant to Hernandez's parents' home, where Hernandez stayed. When they arrived, there were vehicles parked at the home, but Hernandez's vehicle was not there. Aguirre, appellant, and their son went to the front door. Aguirre stated that appellant was dressed like a civilian but carried his gun and his badge. Hernandez was not present, but appellant spoke to Hernandez's mother with Aguirre assisting in translating Spanish for appellant.

According to Aguirre, when they had gotten back to the car to leave, appellant decided he was going to "run" the license plates of the vehicles parked at the home. Appellant then called Theodore Gutierrez, a BPD police officer, and gave him the vehicle information of the two vehicles parked at Hernandez's parents' home and asked Gutierrez to run the vehicles and to send the information to his personal cell phone. After he

3

received the information he requested, he brought Aguirre and their son back to Aguirre's vehicle. At that point, according to Aguirre's testimony, appellant called Hernandez and left a voicemail stating that Hernandez needed to call him back to discuss his relationship with appellant's son and Aguirre. Aguirre explained that a couple of days later, she decided she needed to report what had happened to the police.

Aguirre testified on cross-examination that, at some point following her report to the police, she and appellant had reconciled and moved back in together. She subsequently met with appellant's attorneys after he had been indicted and signed an affidavit of non-prosecution. Aguirre stated that, although she signed the affidavit, the words were not her own. On re-direct, she stated she felt pressured to sign the affidavit.

Luz Dove, the senior director for the crime records division of the Texas Department of Public Safety testified that the information received through the Texas Law Enforcement Telecommunications System (TLETS) is "restricted to criminal justice agencies for criminal justice purposes only." Officers who have access to TLETS are required to complete a training regarding access to and dissemination of the information available through TLETS. Dove explained that it is a misdemeanor if information is accessed through TLETS "for their own personal use," and it is a felony "if they are using it for renumeration." Dove confirmed that on October 15, 2019, appellant accessed TLETS to run a driver's license check on Hernandez. As part of the search, appellant was required to indicate the purpose for his search and appellant indicated it was for a "criminal justice purpose." Shortly after running the driver's license search, appellant also ran a search to determine if there was any "wanted information" for Hernandez.

4

Dove confirmed through TLETS, that on October 20, 2019, Gutierrez accessed the system to run two registered vehicle searches, which Dove stated contained privileged information "not available to the public." Dove stated that running a search for non-criminal justice purposes is a "violation" of the policy and a crime. As part of the search, Gutierrez accessed information contained in the Texas Crime Information Center (TCIC), which contains information related to whether a vehicle is stolen, as well as registration information from the Department of Motor Vehicles, and information from the National Crime Information Center (NCIC). Dove testified that access to the TCIC and NCIC is for law enforcement purposes only. Gutierrez ran a search on two vehicles. On cross-examination, Dove explained that accessing and disseminating the information on TLETS for personal use is a misdemeanor, but it becomes a felony if you are getting money for it. She stated that she did not know whether the information accessed was also available through public websites.

Gutierrez testified that he and appellant attended the police academy together. Several years after the police academy, they were both working for BPD. Appellant was a lieutenant and Gutierrez was a patrolman. In October 2019, appellant was Gutierrez's superior. He testified that there were often requests among the officers to run "suspicious" vehicle information. On October 20, 2019, appellant was off duty and called Gutierrez, who was on duty at the time, and asked him to "run some plates" and to send him a "screenshot" of the information. Appellant relayed the plate numbers to Gutierrez, who then ran the plates through TLETS. Gutierrez agreed that the information he accessed is not made available to the public. When appellant made the request, he did not tell

5

Gutierrez the reason he wanted the plates searched.

On cross-examination, Gutierrez explained that he sent two screenshots to appellant, one for each vehicle. The screenshots showed the names of the owners, the owners' registered addresses, and whether the vehicles had insurance. According to the screenshots, there is no criminal history. Gutierrez stated that there are various reasons that off-duty officers call in plate searches, including suspicious vehicles.

Hernandez[1] testified that he and Aguirre knew each other from childhood, having attended the same middle school. In or around 2019, they were both working at the same office. At the time they were "reacquainted," Hernandez was married, but stated that his marriage was "complicated." He began dating Aguirre in 2019, while he was still married. Hernandez resided with his parents in Brownsville at the time. He has never spoken to appellant, though he testified that appellant left him a voicemail at some point, but Hernandez did not return the call. Hernandez confirmed that he had spent time with Aguirre and appellant's son during his relationship with Aguirre. After appellant, Aguirre, and their son went to Hernandez's parent's house, Hernandez's mother called him regarding the incident. After learning that his plates were run by appellant, he stated that he felt unsafe.

On cross-examination, Hernandez explained that he decided to end his romantic relationship with Aguirre because of his marriage. He also stated that while he understood appellant's concern about having someone around his son, he would not have approached the situation in the way appellant did.

---

[1] At trial Hernandez stated that his full name is David Hernandez Garces. We refer to him as the parties did throughout the record as David Hernandez or Hernandez.

6

Patricia Hernandez, Hernandez's mother, testified that Hernandez lived with her in 2019 when he was separated from his wife. Patricia recalled that in October 2019, appellant, along with a "girl and a small boy" came to her home unannounced. Appellant introduced himself and stated that he was a police officer. Patricia stated that she thought that appellant told her that the young boy was Hernandez's son. She stated that appellant spoke to her in Spanish and that Aguirre did not speak at all. Patricia told appellant she would talk to Hernandez when he got home. Appellant did not ask her about the vehicles at her home.

On cross-examination, Patricia testified that her conversation with appellant left her feeling worried for the little boy. She also agreed that it was normal that a father would want to know who was around his children.

Detective Juan Alvarez with the Brownsville Police Department testified that he was the lead investigator assigned to the case. Detective Alvarez testified that as a police officer, he is a public servant. Detective Alvarez was assigned to the case after Aguirre filed her report regarding appellant running the license plates of the vehicles at Hernandez's home. Detective Alvarez wanted to determine why appellant, an officer in Bishop, was running license plates in Brownsville. He explained that using the system to run license plates "has to be for a government purpose, for an official [use]." As part of his investigation, Detective Alvarez visited Hernandez's parents' home. There were two vehicles parked there with license plates matching those that had been run through the law enforcement system. There was no official government reason to run the plates, and Detective Alvarez determined the plates were run through the system for personal

7

reasons. Through his investigation, Detective Alvarez was able to confirm that appellant told Gutierrez, his subordinate, to run the plates on October 20, 2019. Appellant also placed a call to Hernandez later that same day. Based on his investigation, it was determined that there were sufficient grounds to conclude that the offense of misuse of official information had been committed by appellant.

As to the charges brought against appellant, Detective Alvarez testified that appellant did not need to receive a monetary benefit from the information he obtained, but rather just a benefit or an advantage. Detective Alvarez stated that his understanding was that the "advantage" did not have to be monetary or economic in nature. On cross-examination, Detective Alvarez agreed that the information obtained by running the two license plates could likely be found "through private companies online." However, according to Detective Alvarez, the information received was not the crime, but rather, appellant's use of TLETS, which is not accessible to the public, for personal benefit, rendered his actions illegal under the penal code.

Appellant testified that there would be a "custody battle" with Aguirre for their son following his trial, and if he were convicted of a felony, he believed it would not be beneficial for his chances of gaining custody. When Aguirre started dating Hernandez, appellant believed Hernandez was being "inappropriate" in front of appellant's son, sleeping shirtless. Appellant explained that, according to Aguirre, Hernandez had possible cartel connections, which concerned him. He stated that he knew Aguirre had connections to "armed men" in Mexico.

Appellant explained that on October 20, 2019, he met with Aguirre to exchange their son. On that day, they went to Hernandez's house with Aguirre giving him directions. Appellant wanted to discuss Hernandez being around his son. When they arrived, there were four vehicles at the property, and Aguirre informed appellant that "they were looking for [him]," which he believed to mean cartel connected individuals were looking for him. At that time, he decided to take down the plates to corroborate anything that occurred after that point, as a preventative measure. He had Gutierrez run the plates for him and obtained the information. Afterwards, when he determined it was a "fake allegation" regarding the men looking for him, he did nothing with the information. Appellant stated that he did not obtain a benefit, intentionally harm anyone, or intentionally defraud anyone. When asked how running the two plates was "indeed for a governmental purpose," appellant stated: "Well, the allegation was that somebody was coming to look for me, for my capacity as a police officer."

On cross-examination appellant stated that as a police officer, he did not have the ability to run criminal background reports, that "would have to be a dispatcher" because he lacks the access. When questioned regarding the October 15 background check he performed, appellant responded that he was only doing a "name and date of birth check." While he agreed that he wanted to be sure he knew who was around his son, appellant also stated that he checked into Hernandez because of his potential cartel connections. He confirmed that he understood that police officers are not supposed to run license plate information through TLETS for personal use. When he spoke to Hernandez's mother, he was attempting to discern Hernandez's intent, given that he was a married man "playing

9

father" to appellant's son. Appellant explained that he "wanted to make sure [his] son was safe."

Appellant called Dr. Michael Raymond Sanchez, a police officer and professor at the University of Texas Rio Grande Valley, who testified that there is a difference between "a violation of the access of TLETS" and disclosing the information. According to Dr. Sanchez's testimony, if an officer accesses TLETS improperly, it is merely a violation of their policy, it is only "criminal" behavior when that information is disclosed. Given his understanding of the facts of the case, Dr. Sanchez testified that appellant's actions in running the license plates was not criminal, but it "could be seen as an improper access of the information." Because appellant did not "sell it, use it, leverage" the information, his actions did not rise to the level of criminal. Further, Dr. Sanchez testified that appellant's actions in having the plates run was not necessarily in violation of the TLETS policy because appellant had information that the vehicles may have been connected to cartel members. Dr. Sanchez also stated that the information appellant received on the screenshots from Gutierrez could all be located on "numerous online publicly available tools." He did state that he was not certain if you could obtain insurance information through a public search. Dr. Sanchez explained that the information received by appellant did not contain any criminal background checks.

On cross-examination, Dr. Sanchez stated that he was not currently certified in TLETS, as his certification had expired. He also explained that he interpreted the definition of benefit to mean "an economic gain or an economic advantage," which he stated appellant received neither. Dr. Sanchez stated that his belief was that appellant's

actions were not criminal and were not done for personal reasons, but rather because he believed there was a potential criminal matter.

Appellant also called several witnesses including his parents, younger brother, fiancé, ex-wife, and stepmother to testify as to his good character and reputation for being a law-abiding citizen.

Appellant was found guilty on both counts of misuse of official information and was sentenced to three years' incarceration which was suspended with appellant being placed on community supervision for four years. This appeal followed.

## II.    LEGAL SUFFICIENCY

By his first issue, appellant challenges the sufficiency of the evidence against him, arguing that the State failed to prove that he received "any economic gain or advantage" and failed to prove that the information received was "of a kind prohibited by disclosure."

### A.    Standard of Review & Applicable Law

The legal sufficiency of the evidence to support a conviction is measured by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Brooks v. State*, 323 S.W.3d 893, 894–95 (Tex. Crim. App. 2010). Under that standard, a reviewing court views all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Brooks*, 323 S.W.3d at 894–95 (citing *Jackson*, 443 U.S. at 319). As the trier of fact, the jury is the sole judge as to the weight and credibility of witness testimony, and therefore, on appeal we must give deference to the jury's determinations. *Brooks*, 323 S.W.3d at 894–95. If

11

the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Id.* On appeal, we serve only to ensure the jury reached a rational verdict, and we may not reevaluate the weight and credibility of the evidence produced at trial and, in so doing, substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The sufficiency standard is the same for both direct and circumstantial evidence. *Wise*, 364 S.W.3d at 903.

We measure the sufficiency of the evidence in reference to the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327 (quoting *Malik*, 953 S.W.2d at 240).

Misuse of official information can be committed in various ways. *See* Tex. Penal Code Ann. § 39.06. The State charged appellant under § 39.06(b) which provides that:

> (b) A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:
>
>> (1) he has access to by means of his office or employment; and
>>
>> (2) has not been made public.

12

*Id.* In § 39.06, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code. *See id.* § 39.06(d). Chapter 552 of the Government Code is known as the Public Information Act (formerly known as the Open Records Act). *See* TEX. GOV'T CODE ANN. §§ 552.001–.353.

## B.     Analysis

While his issue states that he challenges the State's evidence on whether a benefit was received and he generally concludes that the State failed to meet its burden in that regard, appellant does not present an analysis on this issue citing to authority and case law regarding this point. *See* TEX. R. APP. P. 38.1. Rather, appellant's first issue in his brief is focused entirely on the State's alleged failure to present sufficient evidence to satisfy § 39.06(d) of the penal code. Appellant's issue as it pertains to the "benefit" argument is overruled. *See id.*

Section 39.06(d)'s definition of information that has not been made public contains two components: (1) information to which the public does not generally have access; and (2) that is prohibited from disclosure under the Public Information Act (PIA). TEX. PENAL CODE ANN. § 39.06(d); *State v. Ford*, 179 S.W.3d 117, 122 (Tex. App.—San Antonio 2005, no pet.); *State v. Newton*, 179 S.W.3d 104, 108–09 (Tex. App.—San Antonio 2005, no pet.); *see also Tidwell v. State*, No. 08-11-00322-CR, 2013 WL 6405498, at *12 (Tex. App.—El Paso Dec. 4, 2013, pet. ref'd) (mem. op., not designated for publication).

### 1.     Information the Public Does Not Generally Have Access To

While it does not appear in his appellate briefing that appellant is challenging the

13

evidence as to the first component of § 39.06(d), we will address it. The State alleged that appellant used a law enforcement system, TLETS, to access information regarding two vehicles parked at Hernandez's residence. Appellant does not deny that TLETS was the source of the information regarding the two license plates. TLETS is not a public system and there is no access to it outside of those certified in the program within law enforcement positions. The information obtained through the system is not for the public. As such, the public does not have access to TLETS information and the first component of § 39.06(d) has been satisfied and is supported by legally sufficient evidence.

### 2.      Information Prohibited from Disclosure

Appellant argues that the State "ignored" the second component of § 39.06(d) and presented no evidence that the information obtained "is prohibited from disclosure under Chapter 552." TEX. PENAL CODE ANN. § 39.06(d). The State presented evidence that Gutierrez sent appellant two screenshots from TLETS, one for each vehicle.

While different plates, each returned similar information, which included: license plate, vehicle identification number, name and address of the vehicle owner, confirmation of insurance, and confirmation of "NO RECORD" per "TCIC." The State argues that, while appellant attempted to show that the information obtained could be found through public databases online, the information regarding confirmation of insurance is not public and, more importantly, the TCIC information that there was "no record" is "confidential information excepted from disclosure under Chapter 552 of the Texas Government Code."

> The purpose of the Open Records Act is to provide public access to "complete information about the affairs of government and the official acts

14

> of public officials and employees." TEX. GOV'T CODE ANN. § 552.001(a) [ ]; *City of Garland* [*v. Dall. Morning News*], 22 S.W.3d [351,] 355–56 [(Tex. 2000)]. The Act defines "public information" as any information that is "collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business: (1) by a governmental body; or (2) for a governmental body . . . . TEX. GOV'T CODE ANN. § 552.002(a) [ ]. Under the Act, public information is required to be made available to the public during normal business hours of the governmental body. [*Id.*] § 552.021.

*Ford*, 179 S.W.3d at 123. The State argues that Chapter 552 excepts from disclosure information that is considered to be confidential by law, either constitutional, statutory, or by judicial decision, and that because criminal history record information is "confidential" under the government code, the State met its burden under § 39.06(d)(2). *See* TEX. GOV'T CODE ANN. §§ 411.083, 552.101. We agree. The State presented evidence that the TCIC notations on the screenshots provided to appellant related to the criminal history of the vehicle's owners. This type of information is considered to be confidential and "may not be disseminated." *See id.* § 411.083(a). Accordingly, the State met its burden to establish that the information received was prohibited from disclosure, and the second component of § 39.06(d) has been satisfied and is supported by legally sufficient evidence.

We overrule appellant's first issue.

### III. CONSTITUTIONALITY OF THE STATUTE

Though appellant's second issue states that § 39.06(b) in conjunction with § 39.06(d) "is unconstitutionally vague on its face" because it "contains a vague enforcement standard that is susceptible to arbitrary enforcement and because it fails to give fair and adequate notice of the type of conduct that is prohibited," his second issue actually argues that § 39.06 is unconstitutionally vague as it applies to him "because it

turns on multiple interpretations."

## A.    Standard of Review

The Due Process Clause of the Fourteenth Amendment requires a legislature to define a criminal offense in its penal statutes in a manner sufficient to inform ordinary people whether their conduct is prohibited and to provide minimal guidelines to govern law enforcement. *See State v. Edmond*, 933 S.W.2d 120, 125 (Tex. Crim. App. 1996). "Without such guidance, a penal statute might be susceptible to arbitrary and discriminatory enforcement." *Id.*

An appellate court presumes the validity of a statute or ordinance attacked on constitutional grounds. *See Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978); *Webb v. State*, 991 S.W.2d 408, 414 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). The court must uphold the ordinance if a reasonable construction will render it constitutional and carry out the legislative intent. *Flores v. State*, 33 S.W.3d 907, 920 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *see Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979). A statute need not be mathematically precise; it need only give fair warning, in light of common understanding and practices. *Rivera v. State*, 363 S.W.3d 660, 672 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Ex parte Anderson*, 902 S.W.2d 695, 699 (Tex. App.—Austin 1995, pet. ref'd)). A statute is not unconstitutionally vague merely because the words or terms used are not defined. *See Edmond*, 933 S.W.2d at 126.

We apply a two-part inquiry to determine if a criminal statute is unconstitutionally vague. To overcome a vagueness challenge, a criminal statute must define the offense

(1) with sufficient specificity that ordinary people can understand what actions are prohibited, and (2) in a manner that does not permit arbitrary and discriminatory enforcement. *See State v. Holcombe*, 187 S.W.3d 496, 499 (Tex. Crim. App. 2006). Either the lack of notice or lack of guidelines for law enforcement constitutes an independent ground for finding a statute void for vagueness. *Adley v. State*, 718 S.W.2d 682, 685 (Tex. Crim. App. 1985); *State v. River Forest Dev. Co.*, 315 S.W.3d 128, 131 (Tex. App.— Houston [1st Dist.] 2010, no pet.).

In addressing an as-applied challenge, we do not address hypothetical situations. *Bynum v. State*, 767 S.W.2d 769, 774 (Tex. Crim. App. 1989). Instead, we consider whether the statute is vague as applied to the defendant's conduct. *Id.* In other words, a defendant must show that the statute is unconstitutional when applied to his specific situation. *Id.*

**B.      Analysis**

As relevant here, appellant was convicted under § 39.06(b) and (d), which provide:

(b) A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:

>      (1) he has access to by means of his office or employment; and

>      (2) has not been made public.

. . .

(d) In this section, "information that has not been made public" means any information to which the public does not generally have access, and that is prohibited from disclosure under Chapter 552, Government Code.

TEX. PENAL CODE ANN. §§ 39.06(b), (d). Appellant contends that the statute can turn on "multiple interpretations" making it vague. He argues that "as applied" to him, the phrase

17

"obtaining a benefit" is vague because there is no evidence of a pecuniary gain. He asserts that the State's evidence related to the benefit was "that the mere obtaining of information" was an "advantage" under the penal code's definition of benefit. *See id.* § 1.07(a)(7) ("'Benefit' means anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested."). Appellant states that there is uncertainty as to whether the word "economic" applies to both "gain" and "advantage" or not, and he asserts that without clarification, the meaning of benefit is vague because someone can be charged on "some unknown advantage." However, this is not the case. The State presented evidence that the benefit obtained by appellant was the advantage of obtaining non-public information related to his ex-girlfriend's new boyfriend, an advantage an ordinary citizen would not have. How the appellant benefitted need not be alleged in the indictment, it is essentially evidentiary. *See State v. Goldsberry*, 14 S.W.3d 770, 773 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (citing *Thomas v. State*, 621 S.W.2d 158, 161 (Tex. Crim. App. [Panel Op.] 1980)).

Though appellant also asserts there is a "vagueness problem" with the "statute with reference to 'any information to which the public does not generally have access,'" he goes on to explain that "if" appellant had received information that the vehicle was stolen or related to criminal activity, it would have been a governmental purpose and he would not have been charged—this is a purely hypothetical situation, and one we will not address. *See Bynum*, 767 S.W.2d at 774. Further, because we have already discussed appellant's issue related to whether the information was available to the public, we need not readdress it here.

18

There are different ways in which a person can violate a statute, the statute need not be uniform nor "mathematically precise; it need only give fair warning, in light of common understanding and practices." *Rivera*, 363 S.W.3d at 672 (citing *Ex parte Anderson*, 902 S.W.2d at 699). Appellant asserts the phrases "advantage," "nongovernmental purpose," and "information to which the public does not generally have access" are unconstitutionally vague because there were discrepancies in their meanings during his trial—specifically he argues that Detective Alvarez and appellant, as a police officer, had a different understanding of whether the TLETS system could be used in an off-duty capacity to run license plates. We disagree with this characterization. The issue was not whether an off-duty police officer could run a license plate, at issue was the reason for running the license plate—governmental or nongovernmental. Here, the State presented evidence that the appellant's purpose in running the two license plates of the vehicles parked at Hernandez's residence were for nongovernmental reasons, namely, to learn information about his ex-girlfriend's new boyfriend. The record thus does not overcome the presumption that laws passed by the Legislature are constitutional.

We overrule appellant's second issue.

## IV.    CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
21st day of March, 2024.